| School | 1970-71 | | | | 1971-72 | | | | 1972-73 | | | | 1973-74 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | B | Tot | Ratio | W | B | Tot | Ratio | W | B | Tot | Ratio | W | B | Tot | Ratio |
| Chatom Elem. | 14 | 7 | 21 | 67/33 | 15 | 8 | 23 | 65/35 | 14 | 8 | 22 | 64/36 | 15 | 7 | 22 | 68/32 |
| Chatom Middle | 11 | 4 | 15 | 73/27 | 11 | 7 | 18 | 62/38 | 11 | 6 | 17 | 64/36 | 11 | 6 | 17 | 64/36 |
| Boykin Elem. | 8 | 9 | 17 | 47/53 | 9 | 10 | 19 | 47/53 | 9 | 11 | 20 | 45/55 | 7 | 14 | 21 | 33/67 |
| Fruitdale High | 14 | 6 | 20 | 70/30 | 17 | 8 | 25 | 68/32 | 17 | 8 | 25 | 68/32 | 16 | 8 | 24 | 67/33 |
| Leroy High | 26 | 10 | 36 | 72/28 | 27 | 10 | 37 | 74/26 | 26 | 14 | 40 | 65/35 | 27 | 11 | 38 | 71/29 |
| McIntosh High | 11 | 9 | 20 | 55/45 | 10 | 15 | 25 | 40/60 | 7 | 17 | 24 | 29/71 | 6 | 17 | 23 | 26/74 |
| Millry High | 20 | 9 | 29 | 69/31 | 23 | 9 | 32 | 72/28 | 22 | 11 | 33 | 67/33 | 21 | 11 | 32 | 66/34 |
| Reed's Chapel | 6 | 1 | 7 | 86/14 | 6 | 1 | 7 | 86/14 | 5 | 2 | 7 | 71/29 | 4 | 3 | 7 | 57/43 |
| Wagarville Elem. | 5 | 3 | 8 | 62/38 | 6 | 3 | 9 | 67/33 | 6 | 2 | 8 | 75/25 | 4 | 2 | 6 | 67/33 |
| Washington Co. High | 17 | 4 | 21 | 81/19 | 15 | 3 | 18 | 83/17 | 16 | 4 | 20 | 80/20 | 16 | 4 | 20 | 80/20 |
| Total | 132 | 62 | 194 | 68/32 | 139 | 74 | 213 | 65/35 | 183 | 83 | 216 | 62/38 | 127 | 83 | 210 | 60/40 |

| School | 1974-75 | | | | 1975-76 | | | | 1976-77 | | | | 1977-78 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | B | Tot | Ratio | W | B | Tot | Ratio | W | B | Tot | Ratio | W | B | Tot | Ratio |
| Chatom Elem. | 17 | 6 | 23 | 74/26 | 18 | 7 | 25 | 72/28 | 18 | 7 | 25 | 72/28 | 19 | 7 | 26 | 73/27 |
| Chatom Middle | 9 | 5 | 14 | 64/36 | 10 | 5 | 15 | 67/33 | 12 | 7 | 19 | 63/37 | 12 | 7 | 19 | 63/37 |
| Boykin Elem. | 6 | 15 | 21 | 29/71 | 8 | 15 | 23 | 35/65 | 7 | 16 | 23 | 30/70 | 6 | 15 | 21 | 29/71 |
| Fruitdale High | 14 | 6 | 20 | 70/30 | 18 | 8 | 26 | 69/31 | 21 | 8 | 29 | 73/27 | 21 | 8 | 29 | 73/27 |
| Leroy High | 28 | 11 | 39 | 72/28 | 28 | 11 | 39 | 72/28 | 30 | 8 | 38 | 79/21 | 29 | 9 | 38 | 76/24 |
| McIntosh High | 8 | 17 | 25 | 32/68 | 8 | 17 | 25 | 32/68 | 10 | 17 | 27 | 37/63 | 13 | 14 | 27 | 48/52 |
| Millry High | 24 | 8 | 32 | 67/33 | 28 | 8 | 36 | 78/22 | 28 | 7 | 35 | 80/20 | 30 | 7 | 37 | 81/19 |
| Reed's Chapel | 5 | 0 | 5 | 100/0 | 5 | 0 | 5 | 100/0 | 5 | 0 | 5 | 100/0 | 6 | 1 | 7 | 86/14 |
| Wagarville Elem. | 3 | 3 | 6 | 50/50 | 3 | 3 | 6 | 50/50 | 4 | 3 | 7 | 57/43 | 3 | 3 | 6 | 50/50 |
| Washington Co. High | 16 | 4 | 20 | 80/20 | 17 | 4 | 21 | 81/19 | 20 | 4 | 24 | 80/20 | 19 | 4 | 23 | 83/17 |
| Total | 131 | 77 | 208 | 63/37 | 143 | 78 | 221 | 65/35 | 155 | 77 | 232 | 67/33 | 158 | 75 | 233 | 68/32 |

**Carl H. NEUMAN, Plaintiff,**
v.
**Otis G. PIKE, Defendant.**

**No. 77 Civ. 2937 (VLB).**

United States District Court,
S. D. New York.

May 26, 1978.

Lola S. Lea, Trubin Sillcocks Edelman & Knapp, New York City, for plaintiff.

Aaron Donner, Donner, Fagelson, Hariton & Berka, Bay Shore, for defendant.

## MEMORANDUM DECISION

VINCENT L. BRODERICK, District Judge.

The following facts, which I find, provide the framework within which the issues in this lawsuit arose.

The Long Island Home, Ltd. ("the Corporation") is an old, well-run, and profitable psychiatric hospital and nursing home in Suffolk County, Long Island. Since 1949 Otis G. Pike, the defendant, has been a shareholder and director of the Corporation. In 1974 Pike decided to obtain control of the Corporation: by October, 1975 he had effectively done so. Certain of the maneuvers which he executed during the period 1974–1977 are a part of the subject matter of this action.

The Corporation is closely held, with some 40 to 50 shareholders. Between 1949 and 1974, Pike and his wife acquired 276 shares of Corporation stock at an average cost of $154.00 per share. In 1974, the 276 shares represented approximately 9% of the total number of shares outstanding.

Prior to December, 1972, Frances Ryder Walker owned 843 shares of the Corporation, representing the single largest block of shares. In December, 1972, Mrs. Walker died and bequeathed her 843 shares to Co-

lumbia and Cornell Universities. In August, 1973, the Walker shares were offered for sale to various persons, including the Corporation and Pike.

In 1974, at a time when Pike knew that the purchase of the Walker shares was under consideration by the Board of Directors of the Corporation, Pike decided to attempt to buy these shares as a first step towards gaining control of the Corporation for himself. He did not inform the Board of Directors of his intentions. Pike did not have enough money to finance the purchase himself. He called James B. Millard, a law school classmate and an old friend, and asked Millard to participate with him in the purchase of the Walker shares, to the end of acquiring control of the Corporation. Millard declined to participate himself, but undertook to attempt to find someone who would be willing and financially able to participate with Pike in the acquisition.

Millard approached Dr. Carl H. Neuman, the plaintiff, whom Millard knew casually through a previous business matter. Neuman was a successful entrepreneur in the health care industry, and Millard knew him to have investments in, and management experience with, health care institutions.

Neuman asked Millard how he knew Pike and whether or not Pike was a reliable partner for the venture. Millard informed Neuman that he had known Pike for approximately 25 years, and vouched for Pike's reliability.

Neuman, who already knew of the Corporation, informally investigated the situation, discussing it with associates in the industry. He then told Millard that he would be willing to participate in the acquisition of shares in the Corporation with a view to obtaining a control position, provided that, if control was acquired, Neuman and Pike would share it equally. Millard transmitted Neuman's position to Pike, who, through Millard, agreed to the proviso.

At that time Pike and Neuman had not met, and they did not in fact meet until March 8, 1975.

Between November, 1974 and January 15, 1975, Millard, at the request of both Pike and Neuman, acted as agent for Pike and Neuman in negotiating for the purchase of the Walker shares. During these negotiations his principals were not disclosed: Pike had specifically instructed Millard that his role as a principal was not to be revealed.

Upon Pike's instructions, with Neuman's assent, Millard offered $500 per share for the Walker stock. The offer was refused. Sometime thereafter, Pike suggested to Millard that he offer $800 per share for the Walker stock. Millard, again with Neuman's assent, did so. He was told by William Bloor, who was acting on behalf of Columbia and Cornell Universities with respect to the Walker shares, that the stock had already been sold. Bloor did not identify the putative purchaser, which, it later developed, was actually the Corporation. Although no contract of sale had been consummated when he spoke to Millard, Bloor apparently believed that a contract to sell the Walker shares to the Corporation was imminent.

Millard reported his conversation with Bloor to Pike and Neuman. Pike told Millard that the sale which Bloor reported would not take place. When Millard asked Pike how he knew that, Pike's response was: "Never mind. Let's just say I'm playing a very sporting game here."

He was indeed. At this very same time, November, 1974, the Board of Directors of the Corporation, with Pike participating, was considering whether or not it should purchase the Walker stock. The consensus of the Board was that $800 per share was too high a price, and a decision of the Board to that effect was transmitted to the Columbia-Cornell representative. Pike participated at the Board meeting in which this matter was considered, and never disclosed to the other Board members that he did not consider $800 per share too high a price, and that he was planning to participate with Neuman in a purchase of the Walker shares at that price.

In December, 1974, Millard again offered on behalf of his undisclosed principals Pike

and Neuman to purchase the Walker shares. This offer, at a price of approximately $828 per share, was accepted on or about January 15, 1975. A downpayment of $30,000, furnished by Neuman, was made and a closing was scheduled for March 14, 1975.

In January and February, 1975, Millard as agent for his undisclosed principals, and Pike, sought to purchase shares from other shareholders or (in the case of Pike) to obtain proxies from other shareholders.

At a February 22, 1975 meeting of the Board of Directors of the Corporation, purchase of the Walker shares by the Corporation was again discussed. The directors at that point knew that "an outside group", represented by Millard, was attempting to acquire shares of the Corporation, since various shareholders had been approached. The members of the Board, aside from Pike, did not know that an agreement to purchase the Walker shares had already been made through Millard. Pike who did not reveal his relationship to Millard, opposed the purchase of the Walker shares by the Corporation, ostensibly because it would deplete the treasury. Despite Pike's opposition, the Board of Directors decided to write a letter with respect to the Walker shares, suggesting possible purchase of the shares by the Corporation at $850 per share. Pike was present when the decision to send this letter was made.

On that same date the members of the Board, with the exception of Pike, sent a letter to shareholders of the Corporation. This letter was in response to a letter that Millard had sent to various shareholders, offering on behalf of "undisclosed associates" to purchase shares of the Corporation from these shareholders. In their letter, the Board members urged the shareholders not to sell their shares to Millard.

Although some members of the Board suspected it in February, 1975, the directors as a group did not learn that Pike was involved in either the Walker share purchases or the Millard purchase offer to shareholders until May, 1975.

On March 8, 1975 Pike and Neuman met for the first time. Also in attendance at that meeting were Millard and Andrew Schoen, Neuman's attorney. While the contract to purchase the Walker shares had already been made, the major part of the payment for the Walker shares (and for other shares needed for control to vest in Pike and Neuman) had not yet been made. As of March 8, 1975, Pike had contributed $108,800 in cash and had assumed personal obligations of $28,800.00 in connection with the acquisition venture and Neuman had contributed $70,500 in cash. The parties knew on March 8, 1975 that very substantial additional cash payments would be required and that Neuman would make such payments.

At the meeting of March 8, 1975 Pike and Neuman discussed the manner of exercising the control they then anticipated obtaining. They agreed that when control was obtained:

(a) Pike and Neuman would exercise control on an equal basis;

(b) a Board of Directors would be elected for the Corporation consisting of five persons: Pike, Neuman, Millard, a designee of Pike, and a designee of Neuman—their 1975 slate of Directors would consist of Pike, Neuman, Millard, Aaron Donner as Pike's nominee, and Andrew Schoen as Neuman's nominee;

(c) Neuman would be president of the Corporation; Pike would be general counsel and Millard would be secretary;

(d) the compensation paid by the Corporation to Neuman and to Pike would be equal; and

(e) there would be restrictions on the transferability of stock by Pike and by Neuman.

In fact, as subsequent developments made clear, Pike had no intention on March 8, 1975 or at any time of sharing control with Neuman, or of honoring his agreement with respect to the designation of directors. He was still playing "a very sporting game."

After March 8, 1975, Neuman contributed $402,420 to the acquisition program. These monies were paid in reliance on the oral agreement which Neuman entered into with Pike on March 8, 1975.

By the time control was acquired Pike had contributed cash, stock and notes in excess of $600,000 to the acquisition program, and Neuman had contributed cash and notes in excess of $700,000.[1]

Millard acquired the Walker stock from the universities on March 14, 1975. On that same date he executed a declaration in which he acknowledged that all Corporation shares acquired by him were and would continue to be held by him as nominee for Neuman and Pike, who "provided the total consideration for said acquisition and they being the sole beneficiaries of such shares in accordance with a mutual agreement between them." The "mutual agreement" referred to by Millard in this nominee declaration was the oral agreement reached on March 8, 1975 between Pike and Neuman.

By March 19, 1975, Pike and Millard had together accumulated 1,513 shares of the Corporation, constituting 52% of the outstanding shares. Of the 1,513 shares, 843 were the Walker shares acquired and held by Millard as agent; 276 were shares which had been acquired by Pike prior to 1974; and 394 were shares bought on behalf of the venture by Pike and Millard from other stockholders, including 60 shares bought by Pike from one Grace Stevens. To insure the equal control to be exercised by Pike and Neuman, the 1,513 shares bought on behalf of the venture were to be split. That is, Pike and Neuman each owned, or had rights of ownership in, 756.5 shares of the Corporation.

In March 1975, at the urging of John C. Robbins, a director and Secretary, the Board of Directors of the Corporation decided to refuse to effect a transfer of the registration of the Walker shares on the books of the Corporation; without such a transfer, the shares could not be voted. Robbins, while not certain, suspected that Pike was involved in the acquisition program being "fronted" by Millard. Ostensibly, the refusal to register the transfer was to be because of concern with the New York Public Health Law[2] and usurpation of

---

1. The shareholders' agreement of October, 1975 provided for a cash payment from Pike to Neuman over a five year period of time "in order to equalize the contribution of the Neuman group in cash and the Pike group in cash and stock to the acquisition of 1,513 shares of Common Stock by each Group." In a letter of December 31, 1975 to Pike and Neuman, Millard informed them that he inserted the figure $43,838 into the section of the shareholders' agreement providing for the "equalizing" payment from Pike to Neuman.

2. Section 2801-a(4)(b) of the New York Public Health Law (McKinney's 1977) provides in substance that if there is a transfer of 10% or more of the stock of a corporation operating a "hospital" (which term includes nursing homes [Public Health Law, § 2801, subd. 1]), or if any transfer results in control of 10% or more of the corporation stock by any person, the transfer "shall be subject to approval by the public health council in accordance with the provisions of subdivisions two and three of this section [section 2801-a] and rules and regulations pursuant thereto." Paragraph (b) of subdivision 4 of section 2801-a goes on to provide:
   In the absence of such approval, the *operating certificate* of such hospital shall be subject to revocation or suspension. (Emphasis supplied).

The Long Island Home brought an action in state court seeking a declaratory judgment that the provisions of Section 2801-a could not be applied retroactively to hospitals existing and operating a nursing home prior to the enactment of the law on June 1, 1970 and so do not apply to the Long Island Home.

On September 26, 1976 the Supreme Court, Special Term (George L. Cobb, J.) entered judgment in *Long Island Home, Ltd. v. Whalen, as Commissioner of Health, et al.*, 87 Misc.2d 1008, 386 N.Y.S.2d 932. Justice Cobb granted Long Island Home's motion for summary judgment and enjoined the Commissioner of Health from applying the provisions of Section 2801-a to the Home.

The Commissioner of Health appealed from the judgment and on April 6, 1978, the Supreme Court, Appellate Division, Third Department (Civ. No. 32023) reversed the lower court. The Appellate Division held that Section 2801-a does apply to the Long Island Home and its stock and is constitutional as so applied.

At a Board of Directors meeting held on May 6, 1978, a resolution was passed deciding that the Long Island Home will not appeal the decision of the Appellate Division, but will comply with Section 2801-a. This means that Pike and Neuman must go through the accreditation

corporate opportunity by Mr. Pike. In fact, the Board members were not sure of the legal bases for the refusal, and their motivation was a last ditch effort to preserve the ongoing Board as they realized they had lost control of the Corporation.

Pike was concerned about possible transfer problems. In order to test the Board position *re* transferring the stock, Pike, at the Board meeting of March 15, 1975, asked the Board to transfer the block of Stevens stock which he had purchased, as a "test case" for the larger block of Walker stock. The Board refused and on March 24, 1975 Pike brought an action in state court to compel the transfer.

On April 22, 1975, a settlement of this *Pike v. Robbins* lawsuit was reached. One of the elements of the settlement, which was negotiated by Millard, was that for the year commencing May, 1975 Messrs. Weeks and Robbins, who had been directors for a period of years, would continue to be on the Board. While the presence of Weeks and Robbins on the Board would prevent Neuman and Pike from each designating a Board member in accordance with their March 8, 1975 agreement, Neuman consented that Weeks and Robbins would be elected to the Board for the year commencing May, 1975.[3]

At the annual shareholders' meeting of May 1975, a Board was elected consisting of Pike, Neuman, Millard, Weeks and Robbins.

At some point subsequent to the settlement of the *Pike v. Robbins* legal action, Weeks and Robbins became allied with Pike. Pike, Weeks and Robbins constituted a majority of the Board of Directors and hence effectively controlled the Corporation.

Between May 1975 and October 18, 1975, drafts of a proposed written shareholders' agreement were prepared by Pike and Neu-

man's attorney, Schoen, and exchanged between Pike, Neuman and Millard. This proposed shareholders' agreement was intended to memorialize the oral agreement between Neuman and Pike of March 8, 1975. All of these proposed drafts provided for a Board of Directors, beginning May, 1976, consisting of Pike and a designee nominated by Pike, Neuman and a designee nominated by Neuman, and Millard. In a letter to Millard of June 6, 1975, Pike stated that he agreed with this formula for directors, but noted that "next May we might want to keep Robbins and Weeks on the board."

On October 18, 1975, Neuman, Pike, Millard and Schoen met to discuss the latest draft of the proposed shareholders' agreement, prepared by Schoen. Pike refused to sign it. At that meeting Pike for the first time disclosed to Neuman that he would only agree to vote for Pike, Neuman and Millard; he would not sign any agreement requiring him to vote for designees of himself and Neuman as directors.

Pike also told Neuman on October 18 that he could live without any shareholders' agreement at all. When Neuman protested that Pike's position was contrary to is earlier representations, Pike threatened to sell his stock to a third person.

Millard was very upset when he heard Pike's position. He told Pike that Pike had a moral obligation to sign the agreement as it had been contemplated in March and in the drafts circulated since March. Millard was concerned because he had brought Neuman into the venture and had vouched for Pike's reliability.

The October 18, 1975 meeting ended abruptly. Pike left after delivering an ultimatum: either the written agreement would be the way Pike wanted it or Neuman would buy Pike's shares at a price to

---

proceeding for holders of more than 10% of the stock.

However, Dr. Neuman, acting alone, allegedly has authorized an appeal of the decision of the Appellate Division.

**3.** The by-laws of the Corporation provide as follows:

"Each director shall hold office until the next annual meeting of the shareholders *and* until his successor has been elected and qualified, unless he shall have resigned or shall have been removed . . . ."

be determined following an appraisal of the Corporation's real estate.

Neuman was disturbed. He could not afford to buy Pike's shares and his counsel, Schoen, advised him that his investment was in jeopardy. Schoen pointed out that without a written agreement, Neuman could wind up in a minority position with none of the rights Pike had represented on March 8 would be his.

After the October 18 meeting, Pike revised Schoen's draft, and forwarded the revision to Millard on October 21, 1975. His principal revision was to change the requirement that the Board consist of Pike, Neuman, Millard, and a designee of Pike and a designee of Neuman. The Pike document provided that Neuman and Pike would vote their shares for Pike, Neuman and Millard as directors: nothing was provided for with respect to the remaining two seats on the Board. As Pike put it in a covering letter to Millard, the draft left the designation of the other two directors "up in the air." The Pike draft also provided that the Pike shares and the Neuman shares could be voted only as Pike and Neuman agreed; if they were unable to agree, the shares would not be voted. Pike had signed this draft.[4] In his letter to Millard, Pike stated that "This document is sent to you in escrow and is to be held by you in escrow for a period of 90 days."

When Neuman received Pike's draft he consulted Schoen. Schoen advised Neuman that the 90 day "escrow" was meaningless. He told Neuman that he was in great peril and that it was imperative that he sign the document Pike had prepared or all could be lost. Schoen advised, and Neuman perceived, that unless Neuman signed he would have no assurance that he would be a director of the corporation; no assurance that he would be a chief executive officer; no assurance of any voice in the Corporation's affairs; and no assurance that Pike would not sell his shares to someone else leaving Neuman in a minority position after an investment of more than $400,000. Schoen did not advise Neuman to commence an action against Pike but told him to sign immediately so that he would be protected. Schoen did not discuss with Neuman a clause in the proposed agreement which stated that "this agreement supersedes all prior understandings and agreements."

On October 31, 1975, Neuman and his wife signed the shareholders' agreement as drafted by Pike. Thereafter, the Pikes signed also.

From that time until May, 1977 when this action began, Pike and Neuman both acknowledged the existence of, and the binding effect of, the shareholders' agreement of October, 1975.[5]

---

**4.** The draft was not signed by Pike's wife, although her signature was necessary to make the agreement binding.

**5.** Instances of acknowledgment of the October agreement include the following:

On February 21, 1976, Neuman signed a receipt for Otis Pike for the sum of $40,800.00. The receipt, signed by Neuman, stated that the sum was due "under the stockholder agreement . . . dated October 27, 1975."

Neuman sent a letter dated March 12, 1976 to Pike in which Neuman set forth provisions of a proposed resolution of their conflict. At page 4 of the proposal, the fourth paragraph reads as follows:

You and I both agree that these matters will be resolved in one way or the other, i. e., either I am to be bought out or you are to be bought out. . . . Thus, the existing provisions of the Stockholders Agreement in regard to the giving of notice of desire to sell to

one another or to the corporation is hereby mutually waived.

The "Stockholders Agreement" referred to is the agreement of October, 1975, which does have a provision concerning notice of desire to sell. While restrictions on transferability of shares were part of the March, 1975 agreement, there is no evidence that a notice provision was included in March, 1975. Moreover, Neuman's letter concerns resolution of the problems stemming from the October agreement, i. e., one party buying out the other, and in the context of the letter, the only reasonable inference is that the "Stockholder Agreement" Neuman refers to is that of October, 1975.

Similarly, in a letter from Neuman to Pike dated September 2, 1976, Neuman outlined a proposed agreement between the parties for the purchase of the Pike shares by Neuman. Paragraph XII of the letter, at page 5, states:

Simultaneously with the Closing, the existing Shareholder Agreement between the Neuman Group and the Pike Group shall be and shall

Thus, Neuman became president of the Corporation and Pike became general counsel; they drew equal compensation from the Corporation.

In early 1976, after Neuman had obtained the necessary financing, Neuman proposed that he and Pike settle their differences by Neuman purchasing Pike's shares. Negotiations were in progress when it came time to select the candidates to be elected as directors at the 1976 annual shareholders' meeting. Neuman wanted Weeks and Robbins off the Board. Pike effectively controlled the Corporation with Weeks and Robbins on the Board, and he insisted that they remain. Neuman ultimately agreed to vote with Pike for the re-election of Weeks and Robbins, and they were re-elected at the May, 1976 meeting.

Negotiations dragged on. Finally, Neuman offered Pike all cash, for his shares. By letter of March 1, 1977, Pike responded that he would not sell to Neuman under any circumstance, even in an all cash transaction.

At the March 26, 1977 meeting of the Board of Directors, the Board voted in favor of a motion, seconded by Neuman, that proxy notices be sent to shareholders, soliciting proxies to be voted in favor of continuing the present directors. There was a subsequent Board of Directors meeting in April 1977; the proxies were not objected to by Neuman or anyone else. Subsequently, however, Neuman and Millard solicited some shareholders, by letter of May 5, 1977 and enclosed proxy form, for proxy votes which would be voted for a Board of Directors consisting of Pike, Neuman, Millard and two designees of Neuman, and thus against the re-election of Robbins and Weeks. Neuman proposed this because of disagreement with Weeks and Robbins as to cooperate management decisions, and as a response to the majority control of Pike, Weeks and Robbins. Neuman authorized the distribution of a mailgram identical to the letter and proxy form, also in connection with his proxy solicitation. The mailgram, and the letter with proxy enclosed, were sent the same day. On the proxy form itself, it was clear that Pike was mentioned only as an addressee of the proxy at the Corporation, along with Neuman and Millard. The reference to Pike in the mailgram is garbled because there is no clear delineation between the letter and the text of the proxy.[6] Neuman did not intend to

---

be deemed to be cancelled and terminated, and of no further force or effect.

I find that the Neuman reference to "the existing Shareholder Agreement" refers to the October, 1975 agreement. As with the letter of March 12, 1976, the entire discussion involves problems which resulted from the October agreement, problems which presumably would not have evolved from the March agreement.

On December 17, 1976 Neuman again wrote to Pike, this time on behalf of Millard and also in connection with rectifying a compensation differential between Pike and Neuman. The third paragraph of the letter begins, "Our agreement states that we share equally in salary. . . ." While Pike and Neuman agreed in March, 1975 that they would receive equal compensation, the March agreement was oral; an oral agreement does not "state". The written October agreement also provides for equal compensation, and I find that the reference to "our agreement" contemplates the October agreement.

Thus, in all of the above communications, Neuman acknowledged the October, 1975 agreement as an agreement between the parties.

I also note a letter of December 31, 1975 from Millard to Neuman and Pike. This letter was ". . . intended to enable you and your spouses to confirm for the record, the further agreements among you." The letter continues:

> All of the matters set forth in Otis' letter of October [29], 1975 . . . are agreed to by all parties concerned. In this connection, I have inserted the amount of $43,838 in the blank space of the stockholders agreement,

. . ..

Neuman acknowledged, on cross-examination in the hearing before me, receipt of Millard's letter, the fact that the October, 1975 document did have a blank space as referred to by Millard, and that the March, 1975 agreement, being oral, of course could not have a "blank space."

6. Mailgram.
> Gentlemen the purpose of this letter is to advise you that, during the past month, several serious disputes have arisen between Messrs Carl H Neuman and James C. B. Millard Jr, on the one hand, and Messs (sic) Morris Weeks and Jack Robbins, on the other hand, all of whom are members of the board of directors of the Long Island Home

represent to the shareholders that Pike was participating in the proxy solicitation. Neither Pike nor his reputation was damaged by this proxy solicitation.

Pike filed an action, *Pike v. Neuman*, Index No. 77–8842, in Supreme Court for the State of New York, Suffolk County, seeking an injunction restraining the voting of the Neuman proxies. The Supreme Court, per Geiler, J., issued a temporary restraining order, halting the 1977 shareholders' meeting.

Shortly thereafter, on June 16, 1977, Newman commenced this action.

In September, 1977 Neuman by letter sent Pike information on five persons whom he suggested as possible directors of the Corporation commencing in the spring of 1978. He asked Pike to choose one or more as a designee of the Pike-Neuman group for director, and to agree to vote with Neuman for that director. Pike did not respond to Neuman's letter.

He did not respond because he effectively controlled the Corporation with Weeks and Robbins on the Board, and so long as he and Neuman did not agree on other designees Weeks and Robbins would, under the by-laws of the Corporation and as a practical matter, remain on the Board.

Neuman needed Pike's agreement to vote for one or more of his nominees because of the provision in the October, 1975 agreement that the shares held by Pike and Neuman must be voted together or not at all.

It was, and is, Pike's opinion that he can refuse to agree to vote for someone suggested as a designee for director by Neuman, even if the withholding of his agreement is unreasonable.

Pike, knowing that Neuman wanted Weeks and Robbins off the Board, has failed to present any alternative nominees to Neuman for his approval.

Thus, Neuman was being precluded from exercising meaningful control of the Corporation. He could not exercise independent control of the Corporation because Pike had refused to sell his shares. He was effectively prevented from exercising equal control with Pike by the Pike-Weeks-Robbins alliance. Because of this, Neuman has been unable to effect various policy changes in the operation of the Corporation, e. g., refinancing of the existing mortgage on the Long Island Home, change in the capital structure of the Corporation, increase of the dividends on Corporation stock. Weeks and

Ltd (the "Company"). These disputes now appear to be irresolvable and involves fundamental financial policies of your company. Messrs Neuman and Millard, for example, strongly believe that your company should adopt a policy which would reduce certain adverse consequences of the federal income tax laws and materially increase the amount of cash available for distribution to you as dividends. Messrs Weeks and Robbins have strongly resisted new policies and have served notice that they continue to frustrate the development of a forward-looking cooporate (sic) fiscal policy

Accordingly, Messrs Neuman and Millard will, at the forthcoming annual meeting of the stockholders of the company, propose that Messrs Weeks and Robbins not be re-elected as directors of your company and that two designees of Messrs Neuman and Millard be elected in their place. For this purpose we are inclosing (sic) herewith a document, which we urge you to sign and return to us immediately. The document revokes the proxy, which you may have given, solicited in favor of the continuance of

Messrs Weeks and Robbins as directors of your company and contain a new repeat new proxy, designation which appoints Dr Neuman as your proxy for the annual meeting May 1977 Messrs Carl H Neuman Otis G. Pike and James C. B. Millard Jr the Long Island Home Ltd, in care of Dr Carl H Neuman 555 5th Ave New York New York 10017 Gentlemen the undersigned beholder of—shares of the capital stock of the Long Island Home Ltd (the "Company"), hereby

(I) revokes the instrument, dated May–1977 appointing each of you as proxy for the undersigned in connection with the annual meeting of stock holders of the company to be held on May 14, 1977, and (II) appoints and constitutes Carl H Neuman to be the sole substitute and attorney of the undersigned and in the name and on behalf of the undersigned to vote as proxy of the undersigned at said annual meeting of the company—
Very truly yours
Carl H Neuman
James CB. Millard Jr
555 5 Ave

Robbins would not vote for these proposals, and Neuman has been unable to replace one or both of them because of Pike's refusal to consider alternative designees.

In an Order and Judgment entered April 6, 1978, the Supreme Court of the State of New York, per Judge Lipetz, granted Pike's motion for a preliminary injunction; Neuman and Millard were enjoined, pendente lite, from voting any shares of the Corporation owned by them or registered in their name, and from voting any proxies received by them in their names only, except as Pike and Neuman shall jointly agree upon in accordance with the shareholders' agreement dated October 27, 1975.

## The Proceedings Herein

Neuman charges defendant Pike with violation of Section 17 of the Securities Act of 1933, as amended, 15 U.S.C. § 77q; Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b); the Rules and Regulations of the Securities and Exchange Commission promulgated thereunder; and with breach of contract under the laws of the State of New York. Jurisdiction of the claims exist pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act of 1933, as amended, 15 U.S.C. § 77v; Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa, and the principle of pendent jurisdiction.

An amended complaint was filed on July 13, 1977. The amended complaint in substance alleges that Pike fraudulently entered into an oral agreement with Neuman to induce Neuman to purchase stock necessary for control of the Corporation. It asserts that this oral agreement provided for a board of directors consisting of Pike, Neuman, Millard, a designee of Pike and a designee of Neuman, and that Pike later reneged on the agreement and has attempted to exercise control without Neuman.[7]

7. In more detail, the complaint alleges:

In 1974 Pike, as a member of the board of directors of The Long Island Home, Ltd. ("The Corporation"), learned that a substantial number of Corporation shares in the Estate of Frances Walker ("Walker Estate shares") were available for purchase. He notified one James C. B. Millard, Jr. ("Millard"). Pike said that he himself owned approximately 276 shares, and that if Millard could find a partner who could finance the purchase of the Walker Estate shares and any additional shares required, he thought he could obtain majority control of the Corporation. He suggested that the Walker Estate shares might be available at a price of $500 per share.

Millard ascertained from Neuman that he would be willing to finance the purchase provided that he and Pike first agreed as to how the shares to be acquired would be voted "so as to insure voting control". Pike "represented to plaintiff that he agreed that Pike and plaintiff would share voting control of the Corporation."

Millard, following Pike's instructions, offered $500 per share for the Walker Estate shares—the offer was rejected.

Thereafter Millard, upon Pike's instructions and with plaintiff's acquiescence, on the same terms and conditions respecting control, offered $800 per share for the Walker Estate stock. He was advised that negotiations had been completed with a third party. Pike told Millard that the third party transaction would abort, which it did.

Thereafter, Millard purchased the Walker Estate shares with funds advanced by plaintiff, and purchased other shares for the benefit of Pike and plaintiff with funds largely supplied by plaintiff: plaintiff advanced $470,000; and Pike advanced $56,000.

Thereafter plaintiff and Millard learned that the third party against whom they had been bidding was the Corporation, of which Pike was a member of the board of directors.

To induce plaintiff Neuman to provide financing for the purchase of the Corporation shares, Pike had represented and agreed that if they obtained sufficient shares of stock they would jointly exercise control over the corporation by electing as directors Pike, Neuman, Millard, a nominee of Pike, and a nominee of Neuman. Pike further represented that control would be jointly exercised for the benefit of the Corporation, and for the benefit of Neuman and Pike, and that he would not attempt to exercise sole control. The complaint further alleges that these representations by Pike were false, were known by Pike to be false, and were intended to induce Neuman to provide the financing for the purchase for the benefit of Pike.

After the Walker Estate shares were purchased, Pike and Neuman attempted to reduce their agreement to writing. A draft agreement prepared by Pike provided that the shares owned by Pike and Neuman would be voted for Pike, Neuman and Millard as directors, with no provision with respect to whom would be designated as the fourth and

The complaint alleges that unless Pike is restrained he will cause the Board of Directors of the Corporation to consist of a majority of persons controlled by him. It prays that Pike be enjoined from voting his shares for directors in any manner other than for Pike, Neuman, Millard, a nominee of Pike, and a nominee of Neuman. Alternatively, it seeks a direction that Pike sell his shares to Neuman at a price to be determined by the court.

Defendant moved to dismiss the complaint pursuant to F.R.Civ.P. § 12(b) for failure to state a claim upon which relief can be granted. While this motion was *sub judice*, plaintiff applied for a preliminary injunction restraining Pike from taking any steps to interfere with or prevent the holding of the 1978 and subsequent annual meetings of shareholders of the Corporation, and from voting for election as directors at such annual meetings for others than Pike, Neuman, Millard, a designee of Pike and a designee of Neuman.

Pike's motion to dismiss the complaint was denied. The plenary trial, which was consolidated with the hearing on the preliminary injunction pursuant to Rule 65, F.R.Civ.P., was held before me on March 31, April 1, and April 8, 1978.

Neuman, at the close of the trial, amended his complaint to charge Pike with breach of the October 1975 agreement between Pike and Neuman, stemming from Pike's allegedly unreasonable refusal to approve Neuman's nominees as directors of the Corporation.

At the time the plenary trial began, Pike had not yet answered. At the commencement of the trial, Pike orally presented his defenses and counterclaims, which were expanded and formally set forth in his answer filed at the conclusion of the trial. Pike denied the material allegations of the complaint. He alleged that the rights of the parties are set forth in the written agreement executed by them and their wives dated October 27, 1975, which he claimed is the sole agreement between them. He also raised various affirmative defenses.[8]

Pike asserted a counterclaim against Neuman and Millard for actual damages in the amount of $25,000 and damage to reputation in the amount of $100,000 stemming from proxy solicitation by Neuman and Millard in May, 1975. A second counterclaim seeks damages in the amount of $25,000 allegedly suffered from an alleged plan by Neuman and Millard to cause and create a default in Pike's payment for purchase of shares from the Estate of Frances Walker.

### Conclusions of Law

I. Neuman's action is not barred by 28 U.S.C. Section 2283, or by principles of res judicata, "unclean hands" or laches.

II. Neuman has stated a cause of action against Pike under the securities laws, based upon the agreement of March 8, 1975.

III. The provision in the March, 1975 agreement granting Neuman the right independently to designate a director is superseded by the October, 1975 agreement.

fifth directors. To protect his investment, plaintiff Neuman was compelled to execute the agreement drafted by Pike. Since then, Pike has refused "to elect to the board of directors of the Corporation any designee of Neuman."

8. The answer in substance alleges:

1. Plaintiff is guilty of laches in that upon advice of counsel he executed the agreement of October 27, 1975 and did not assert the claims in the complaint until May, 1977;

2. Plaintiff ratified the agreement of October 27, 1975 in writing, and by accepting benefits thereunder;

3. The alleged agreement of March, 1975 is unenforceable because it was oral.

4. Equitable relief should be denied in that plaintiff did not come into court with "clean hands."

5. Because of a decision in an action in the Supreme Court, New York County between the same parties, plaintiff is collaterally estopped from successfully asserting his claims herein.

6. Neuman was a "tippee" in Pike's action to buy the shares, in connection with any claim that the corporation may have against Pike.

7. The State Court decision is res judicata to the issues in this action.

8. Title 28 U.S.C. § 2283 bars an injunction.

9. The October 1975 agreement contains an arbitration provision barring consideration here of Neuman's action against Pike for breach of the October 1975 agreement.

IV. Neuman did not sign the October, 1975 agreement under duress, and has acknowledged the October, 1975 agreement.

V. Neuman's pendent cause of action for breach of the March, 1975 agreement fails. There was no breach between March and October, 1975, and the October 1975 agreement then superseded the March 1975 agreement.

VI. Neuman's claim based on the October, 1975 agreement is not barred by the arbitration clause in that agreement.

VII. Pike has violated the October, 1975 contract because of his unreasonable refusal to approve Neuman's nominees for director.

VIII. The defendant prevails on his first counterclaim. Pike's second counterclaim is dismissed.

## I.

■ *28 U.S.C. § 2283.* Defendant's argument that Title 28 U.S.C. § 2283[9] bars injunctive relief by this court is rejected. Section 2283 bars a federal court from granting an injunction to stay proceedings in a state court except in certain prescribed instances. The relief sought herein, even if granted, would not entail a stay of state court proceedings.

■ *Res judicata.* The state court decision on Pike's motion for preliminary injunction has no *res judicata* or collateral estoppel effect in the action before me. A primary element in the invocation of these concepts is the presence of a *final* judgment. *See* 1B Moore's Federal Practice, ¶ 0.409[1], 0.441[2]. The state court judgment relied upon by defendant is an interlocutory judgment granting preliminary injunctive relief; by its very nature it is not a final judgment. *See Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1953):

> The judge's legal conclusions, like his fact-findings, are subject to change after a full hearing and the opportunity for

more mature deliberation. For a preliminary injunction—as indicated by the numerous more or less synonymous adjectives used to label it—is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness.

The rule is the same under New York Law. *See* Weinstein, Korn and Miller, 5 New York Civil Practice, ¶ 5011.10 at p. 50–78 (looseleaf):

> An interlocutory judgment or a decision upon a motion for interlocutory relief will not satisfy the final judgment requirement. . . .

■ *"Unclean Hands."* Pike alleges that Neuman cannot bring this action because Neuman has "unclean hands" stemming from the Neuman-Millard proxy solicitation in May 1977. This proxy solicitation was clearly improper, given the fact that Neuman had voted as a director in favor of the proxy solicitations approved by the Board of, Directors. It was, however, an understandable tactical response, born of frustration, to the *de facto* and presumably permanent control enjoyed by the Pike group. It does not establish "unclean hands."

■ *Laches.* Nor are Neuman's causes of action barred by laches. Negotiations directed toward non-judicial resolution were in progress until March, 1977, when Pike informed Neuman that he would not sell his shares to Neuman, even for cash. Furthermore, as to Neuman's third cause of action, for breach of the October, 1975 agreement, the action by Pike which allegedly constituted breach did not occur until September 1977.

## . II.

■ Neuman has stated a cause of action against Pike under the securities laws.

---

**9.** § 2283. Stay of State court proceedings

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments. June 25, 1948, c. 646, 62 Stat. 968.

In pertinent parts, Section 10(b) and its regulatory counterpart, Rule 10b–5, make it unlawful for any person to use the means or instrumentalities of interstate commerce, or of the mails, to employ any device, scheme or artifice to defraud or to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.[10]

The statutory language "any person," used with respect to both the perpetrator and the victim of the fraud, is clear. Applied to the facts of this case it includes Pike and Neuman. The phrase "any security" in application here encompasses shares of the Corporation. Pike used the mails and the telephone, an instrumentality of interstate commerce, in his dealings with Neuman and Millard. Pike employed a scheme to defraud, or engaged in acts which operated as a fraud; through Millard and by his own representations, he represented to Neuman that he would share control of the Corporation by giving Neuman the right independently to designate a member of the Board of Directors, while Pike in fact did not intend to share control. Since Neuman would not have purchased the securities but for Pike's representations, Neuman was deceived "in connection with the purchase or sale of any security." *S. E. C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), *rehearing denied*, 404 U.S. 1064, 92 S.Ct. 733, 30 L.Ed.2d 753 (1972).

Neuman does not allege monetary damage or seek monetary remuneration. His cause of action is based upon loss of control; he seeks to share control with Pike through a direction by the court to Pike to vote his shares in accordance with the March, 1975 agreement or to sell his shares to Neuman at a price to be determined by the court.

The absence of a claim of monetary damage does not negate Neuman's cause of action. In accord with the broad remedial nature of the federal securities laws, equitable relief such as that sought by Neuman is appropriate in an action under Section 10(b) and Rule 10b–5. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Symington Wayne Corp. v. Dresser Industries, Inc.*, 383 F.2d 840, 843 (2d Cir. 1967).

### III.

Although, for the reasons set forth in Section II, *supra,* Neuman stated a claim against Pike under the securities laws, on the facts found by me after trial that claim has not been established, and I find for the defendant on this issue. Neuman does not have a claim for loss between March and October, 1975 of the right independently to designate á director, because he showed no inclination or attempt to exercise his right at that time. In fact, he agreed with Pike to re-elect Weeks and Robbins to the Board and did so at the May, 1975 annual meeting of shareholders.

Neuman sustained damage after October, 1975 due to his inability to name a director without consent by Pike, and, as it developed, the consequential right to share in the control of the corporation.

However, Neuman's claim for relief under the securities laws is defeated by his participation in the agreement of October, 1975 and his subsequent acts ratifying the October agreement. The October agreement did not afford Neuman the power

---

**10.** 17 C.F.R. § 240.10b–5 *Employment of manipulative and deceptive devices.*

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national security exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

independently to designate a director. Rather, it provided for the designation of Pike, Neuman and Millard as directors and left the other two "up in the air." The October agreement specifically stated that it superseded all previous agreements. Therefore, pursuant to the October agreement and effective with the signing of the October agreement, Neuman relinquished or waived any right he may have had under the March agreement, and any cause of action for loss after October, 1975 stemming from the March agreement.

■ Neuman alleges that he did not waive his rights under Section 10(b). Waiver of rights under Section 10(b) is indeed not favored, since it may be inconsistent with the deterrent aspect of the securities laws. *Cohen v. Tenney Corp.,* 318 F.Supp. 280, 284 (S.D.N.Y.1970). *See also Royal Air Properties v. Smith,* 333 F.2d 568, 571 (9th Cir. 1964), where the court held that waiver of rights under the 1934 Act should be found only where there was intentional relinquishment of a known right:

> We feel that the waiver of rights under the Securities Exchange Act of 1934 should be limited to those cases where it is intended, and that therefore the right in question must be found to be actually known before waiver becomes effective.

■ The concept that the right must be known before there is an intentional, and so effective, waiver does not require, in the context here, that Neuman explicitly considered and rejected the possibility of Section 10(b) action in October, 1975. It rather contemplates knowledge of the facts necessary to make a decision as to whether or not to seek to invoke Section 10(b). Neuman and his attorney had all the facts in October, 1975 and Neuman made his decision to enter into the October agreement knowingly and intentionally.

## IV.

Neuman argues further that there is no waiver because he signed the October agreement under duress and thus it is not binding upon him. I find to the contrary.

■ Factors to be considered by a court determining whether there was economic duress are: "the age and mental ability of the party seeking to avoid the transaction, his financial condition, the absence of good faith and reasonable belief by the other party making the demand, that he has a good defense or a good cause of action, the adequacy of the consideration passing between the parties, and the adequacy of the legal remedy afforded by the courts." *Manno v. Mutual Benefit Health & Accident Assoc.,* 18 Misc.2d 80, 187 N.Y.S.2d 709 (Sup.Ct.Special Term 1959).[11] *See also First National Bank of Cincinnati v. Pepper,* 454 F.2d 626, 633–34 (2d Cir. 1972), applying New York law on duress, holding that failure to have resort to viable legal remedies negatives a claim of duress:

> [The stockholders] must prove that further resort to legal remedies would have been impracticable or futile in the circumstances and that as a practical matter there was no other means of immediate relief available . . .. Otherwise, the stockholders, represented by competent and knowledgeable counsel, . . . would not demonstrate the element of compulsion necessary to a finding of duress.

■ The only duress or coercion conceivably alleged by Neuman is "economic duress"—i. e., that if he did not execute the agreement he would be left in the position of a minority shareholder, or that Pike might sell his shares to a third person, thus destroying the Pike-Neuman control block.

In October, 1975 Neuman was a middle aged man with considerable investments, and with management experience in con-

11. *See also Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d 124, 324 N.Y.S.2d 22, 25, 26, 272 N.E.2d 533, 535 (1971) concerning economic duress in a contract for goods, ". . . a mere threat by one party to breach the contract by not delivering the required items, though wrongful, does not in itself constitute economic duress. It must also appear that the threatened party could not obtain the goods from another source of supply and that the ordinary remedy of an action for breach of contract would not be adequate." (footnotes omitted).

nection with health care institutions. He had had previous experience with oral agreements as well as written agreements. His financial position was that of a successful entrepreneur in the health care industry. In his dealings with Pike he was assisted by, and acted upon the advice of, able counsel. His alternatives were, or should have been, carefully canvassed.

Persuasive here is, in fact, the adequacy of the remedies available to Neuman in October, 1975. Neuman could have brought an action for specific performance of the March 1975 agreement. He could have brought a 10b–5 action. As for Neuman's fear that Pike might sell his shares, Neuman could have sought a restraining order against such sale. Neuman made a presumably informed decision a) to forego the legal or equitable remedies available and b) to sign the agreement and thereafter to seek a negotiated resolution of the problem, as evidenced by his subsequent offer to buy Pike's shares or sell his own.

In the trial before me, Neuman asserted that the only agreement he ever considered binding was the agreement of March, 1975; he alleged that there is not, in fact, an October, 1975 agreement between the parties. However, Neuman acknowledged the existence and validity and binding nature of the October, 1975 agreement by his comportment subsequent to its execution.

Alternatively, Neuman states that he signed the October, 1975 agreement so that he would be protected. However, as stated above, Neuman also argues that the October agreement is not and never was binding, and that he had no obligations under that agreement. The inconsistency of these positions is apparent—Neuman could not reasonably have signed an agreement for protection and at the same time have considered it not binding.

## V.

In the exercise of discretion I find it appropriate to exercise pendent jurisdiction over the state law claims in this case, as the state and federal claims derive from a common nucleus of law and fact. *United*

*Mine Workers v. Gibbs,* 383 U.S. 715, 725–28, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Although Neuman's federal claim is being rejected, it was a substantial claim, and as opposed to being dismissed before trial, it was fully litigated and considered on the merits. *See United Mine Workers v. Gibbs, supra* at 726, 86 S.Ct. 1130; *Transok Pipeline Co. v. Darks,* 565 F.2d 1150, 1155 (10th Cir. 1977).

Neuman's first state claim is for injunctive relief based upon Pike's alleged breach of the March, 1975 agreement, because of Pike's refusal to vote his shares for a designee of Neuman and his insistence that Weeks and Robbins remain on the Board. The claim is dismissed.

Between March, 1975 and October, 1975 Pike did not refuse to vote his shares for a designee of Neuman; Neuman did not request that Pike do so during this time period. While Neuman alleges that Pike "insisted" that Weeks and Robbins remain on the Board, the fact is that Neuman agreed that Weeks and Robbins be elected to the Board in May, 1975. Thus there was no breach of the agreement between March and October, 1975.

There was no breach of the March, 1975 agreement subsequent to October, 1975, because the March agreement was no longer in effect. As discussed above, it had been superseded by the October, 1975 agreement.

## VI.

Neuman's third claim (and second state claim) is based upon the October, 1975 agreement, with respect to which I also have pendent jurisdiction. Neuman alleges that Pike has violated the October agreement by refusing to share control with Neuman; by unreasonably withholding his assent to a Neuman designee as director; and by insisting that Weeks and Robbins, neither of whom Neuman wants as director, remain on the Board.

Pike raises as an affirmative defense the allegation that this court does not have jurisdiction of this claim because of an arbitration clause contained in the agree-

ment.[12] Pike, however, fully participated in the trial of this action, and he has resisted Neuman's claims on the basis of the existence and viability of the October, 1975 agreement, which contains the arbitration provision. He has thus waived his right to arbitration. Moreover, the case has been fully litigated before me and a hearing before the American Arbitration Association, or before another court, would involve a repetition of the evidence and the arguments already presented. In the exercise of my judgment, and weighing the competing interests involved, I find that a stay pending arbitration is not warranted in this case. Thus I consider the merits of Neuman's third claim.

## VII.

Pike has continually insisted that Weeks and Robbins remain on the Board, and he has declined to consider or to comment upon other candidates for director proposed by Neuman.

Pike testified that in June, 1975 it was his view that Weeks and Robbins would remain on the Board until he and Neuman could agree on something else. He testified further that he is willing that Neuman should designate a member of the board of directors, "If it is someone that I can agree with," but that he has the right under the October, 1975 agreement unreasonably to withhold his approval of someone Neuman designates or nominates. Moreover, Pike, knowing that Neuman wants Weeks and Robbins off the Board, has not presented any alternative nominees to Neuman for his approval.

■ There is an implied covenant of good faith and fair dealing in every contract. *Kirke La Shelle Co. v. Paul Arm-*

*strong Co.,* 263 N.Y. 79, 87, 188 N.E. 163 (1933), Restatement (Second) Contracts (rev. ed. 1973) § 231. In ignoring Neuman's overtures in this area, Pike has violated an implied covenant of the October, 1975 agreement that he be reasonable.

■ Agreement as to designation of directors is within the ambit of the provision of the October, 1975 agreement relating to the voting of shares on matters agreed upon, which is covered by the implied covenant of reasonableness. It is, moreover, clear that the October, 1975 agreement was intended to set forth the bases upon which Neuman and Pike would share control of the Corporation. Even though Pike, in executing this agreement, had no intention of sharing control, he is bound by, and should be held to, the implied covenant of good faith and fair dealing.

The reason for Pike's position is transparent upon consideration of the effect of Pike's refusal to agree. Pursuant to the October agreement, Neuman and Pike may vote their shares "only in a manner in which they both agree," and if there is no agreement, the shares may not be voted,[13] and then the minority shareholders would control. Thus with Pike's refusal to agree to Neuman's proposed directors, the Pike and the Neuman shares could not be voted for those candidates, and the vote of the remaining minority shareholders would be decisive. A significant fact is that Weeks and Robbins together control more than 25% of the stock of the Corporation. Therefore, if the Pike-Neuman shares are not voted, the Weeks-Robbins shares will elect the remaining directors, and it is apparent that they will be voted for their own continued tenure on the Board. The result will be the continuation of the Board with

---

12. FIFTEENTH: Any controversy or claim arising out of or in connection with this Agreement or any breach of this Agreement shall be settled by binding arbitration in New York, New York, in accordance with the rules of the American Arbitration Association and judgment upon the award rendered may be entered in any court having jurisdiction thereof.

13. With respect to any matter, the Neuman Group Representative and the Pike Group Representative shall vote such shares only in a manner in which they both shall agree. In the event that (i) the Neuman Group Representative and the Pike Group Representative shall be unable to agree as to the manner in which such shares shall be voted with respect to a certain matter, none of such shares shall be voted . . .

the Pike-Weeks-Robbins group in control. While this result is not *per se* in violation of the October, 1975 agreement, the unreasonable action by Pike in furtherance of this result is a breach.

The remedy sought by Neuman is a direction to Pike to approve one of the names submitted by Neuman with his letter of September 2, 1977.

■ Federal courts have general equity power available to fashion such remedies as may be appropriate to particular situations.

I direct that Pike, within one week from the date of this memorandum decision, approve one of the nominees submitted by Neuman or send to Neuman, with a copy to the court, his reasons for withholding his approval. I note that these reasons are to be explicit, evidencing a good faith effort to reach agreement. In the event that Pike does not approve any of Neuman's September, 1977 nominees, Neuman of course may submit additional names, and Pike may submit names to Neuman. I retain jurisdiction over this matter for the purpose of encouraging good faith compliance, and of dealing with any unreasonable refusal to agree.

### VIII.

Pike has predicated a counterclaim against Neuman and a proposed additional defendant Millard, for breach of the October, 1975 agreement, upon the May 1977 Neuman proxy solicitations.

Millard has not been a party to this action, and the case has been fully tried. No motion was made, at any time, to add Millard as a party. Rule 13(h), F.R.Civ.P., provides that, "Persons other than those made parties to the original action may be made parties to a counterclaim . . . in accordance with the provisions of Rules 19 and 20." Rules 19 and 20, F.R.Civ.P., respectively, concern mandatory joinder of parties needed for just adjudication, and permissive joinder of parties defendant if a claim arising out of the same transaction is asserted against them.

■ Rule 13(h) is designed to allow a greater discretion to a trial judge in deter-

mination of whether a party may be added. *Lanier Business Products v. Graymar Co.,* 342 F.Supp. 1200 (D.Md.1972). In the case before me, I find in the exercise of my discretion that joinder should not be allowed.

However, I find that Pike has established his claim against Neuman stemming from the May, 1977 Neuman proxy solicitations. At the March, 1977 meeting of the Board of Directors, Neuman and Pike, as well as the other Board members, agreed upon a management slate for re-election to the Board which would be presented to the shareholders at the May, 1977 annual meeting. A proxy solicitation seeking support of the slate was sent to shareholders. The only reasonable inference is that the Board members would vote their own shares in support of this management slate. This constituted an agreement by Pike and Neuman, under the October, 1975 agreement, as to how they would vote their block of shares.

In derogation of the agreement reached at the March meeting, Neuman sent out a counter proxy solicitation seeking votes to elect two of his designees to the Board. This action by Neuman was contrary to the voting agreement reached with Pike and in violation of the October, 1975 shareholders' agreement.

Considering the nature of Pike's role throughout his dealings with Neuman, I award Pike damages on this counterclaim of $100.

■ Pike also seeks recovery of $100,000 for "slander to his name" and "damage to his reputation" as a result of the inclusion of his name on the Neuman proxy form. Pike's name was present on the letter proxy only as an addressee; in the mailgram, the context was unclear. I have found that Pike's name and reputation were not damaged as a result of the Neuman proxy solicitation and his prayer for recovery is denied.

Pike's second counterclaim is dismissed. No evidence with respect to this claim has been presented, and it first surfaced in defendant's post-trial filings.

Submit judgment on notice.